## J. & O. ALTSCHUL TOBACCO CO. v. COMMISSIONER OF INTERNAL REVENUE.
### No. 5819.

Circuit Court of Appeals, Fifth Circuit.
July 28, 1930.

Earl W. Shinn, of Washington, D. C. (H. B. McCawley, of Washington, D. C., on the brief), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., J. Louis Monarch, John G. Remey, and Morton K. Rothschild, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., for respondent.

Before BRYAN and FOSTER, Circuit Judges, and GRUBB, District Judge.

FOSTER, Circuit Judge.

The Commissioner of Internal Revenue determined deficiencies of income and profits taxes of petitioner for the fiscal years ending August 31, 1917 and 1918, respectively, of $1,388.99 and $2,044.00. The petitioner disputed this and also claimed refunds for the said years respectively of $2,251.12 and $1,355.32, and appealed to the Board of Tax Appeals.

The petitioner contended that it should be classed as a corporation having no invested capital or only nominal capital for the fiscal year ending August 31, 1917, and for that part of its fiscal year of 1918 from August 31, 1917, up to January 1, 1918, under the provisions of section 209 of the Revenue Act of 1917. And that it should be classed as a personal service corporation from January 1, 1918, to August 31, 1918, under the provisions of section 200 and 231 of the Revenue Act of 1918 (40 Stat. 1058, 1076). The board held against these contentions and this appeal followed.

There is no dispute as to the facts found by the board. Stated briefly, those material to a decision are as follows.

Petitioner is a New York corporation with its principal office in Quincy, Fla. It was organized in 1910 by Oscar Altschul, his father, Joseph Altschul, and Lyman Baum, who held respectively 60, 30, and 10 per cent. of its total authorized capital, amounting to $5,000. At the time petitioner was organized the Altschuls were in bankruptcy, and in return for the stock issued to them they assigned to the petitioner certain contracts which they held for the packing and sale of tobacco and some 5,000 pounds of tobacco, for the stock. This tobacco at that time was worth approximately $1.65 a pound. Baum received his stock for services in organizing the corporation. The business consisted of the curing, packing, storing, and sale of tobacco for the account of the growers. For this service the growers were charged 5 cents per pound and 10 per cent. of the gross selling price. When the tobacco was delivered to petitioner, about 1½ cents per pound was paid by the farmers, and as the treatment of the tobacco progressed the farmer was called upon to pay further installments of the packing charge until 5 cents per pound had been paid. Petitioner rented a warehouse at an annual rental of $1,000. The only appliances necessary in treating the tobacco were bulk platforms, bins, and chopping boards. Petitioner sold the tobacco when cured for the account of the farmers. The sales were made in the name of petitioner, charged to the purchaser, and credited to the individual farm-

ers. Collections were made by the petitioner and transmitted to the farmers. If a loss occurred it was charged to the individual farmer whose tobacco had been sold. Oscar Altschul was an expert in the curing and packing of tobacco and he superintended that part of the business. Joseph Altschul assisted in this to some extent and also gave his services in making sales. Baum resided in New York and attended to incidental business that might occur there and also at times made sales. There were no other stockholders. In 1911 Oscar Altschul became a partner with Lee Munroe in the operation of a tobacco farm known as the Altschul Farm. He had no ownership in the real estate. Oscar Altschul attended to the curing and packing of tobacco raised on the farm. These duties were turned over to petitioner some time after the farm was acquired. Petitioner rendered its services to the Altschul Farm at cost and agreed that one-half of the profits were to be paid petitioner in lieu of the customary commissions. The petitioner did not finance the packing of the Altschul Farm crop, but drew on the operators of that farm for such purposes. One-half of the profits of this farm was treated as income of petitioner on its books, but it was in fact retained by Oscar Altschul, and petitioner charged Oscar Altschul with the profits so retained as advances to him. Oscar Altschul died in May, 1917. Thereafter the advances were charged to his estate. After his death his widow performed some services to petitioner, but just how much is not shown. In November, 1918, petitioner's capital stock was increased to $75,000 by the capitalization of surplus and a stock dividend of 1,400 per cent. The balance sheets of petitioner showed items as follows: August 31, 1916: Capital stock, $5,000; cash, $3,167.27; surplus, $46,177.55. August 31, 1917: Capital stock, $5,000; cash, $18,169.90; surplus, $63,413.54; August 31, 1918: Capital stock, $75,000; cash, $29,303.82; surplus, $12,391.37.

In determining the deficiencies the commissioner held that petitioner owned a one-half interest in the Altschul Farm. The board disagreed with this finding, but held that as petitioner had a large surplus in 1917, which served the same purpose of capital assets, petitioner had more than a nominal capital and was not entitled to have its taxes computed under the provisions of section 209 of the Revenue Act of Oct. 3, 1917 (40 Stat. 307). The board further held that for the period from January 1, 1918, to August 31, 1918, petitioner could not be classed as a personal service corporation under the provisions of section 200 and 231 of the Revenue Act of 1918 as 60 per cent. of the stock was held by the estate of Oscar Altschul, which could not contribute any personal services to which income could be ascribed primarily. See 16 B. T. A. 1202.

It is immaterial whether the commissioner proceeded upon the wrong theory in determining the deficiencies. In any event the burden was on petitioner to show that the assessment was wrong. Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385. There is no explanation as to what entered into the surplus except an allegation in the petition to the board that it consisted of assets of such a nature that they could not be distributed. This is rather contradicted by the showing of a large amount of cash on hand which entered into the surplus. The presumption may be indulged that if it were not useful in the business it would have been distributed to the stockholders. The petitioner was in effect carrying on a manufacturing business as well as a commission business. It converted the raw material into a finished product and necessarily had some plant for that purpose in which capital was invested. It is true that the facts show that this plant consisted merely of platforms, bins, and chopping boards; but the value of these articles is not shown. We agree with the board that the surplus should be considered as capital. The amount of capital shown on the books of petitioner was not merely nominal. Feeders' Supply Co. v. Commissioner of Internal Revenue (C. C. A.) 31 F.(2d) 274. We think the petitioner has failed to sustain the burden of showing that its capital was merely nominal during that part of the years 1917 and 1918, to which section 209 of the Revenue Act of 1917 would apply.

We also agree with the finding of the board that petitioner was not entitled to be classed as a personal service corporation. Sixty per cent. of the stock was held by the estate of Oscar Altschul. Therefore the profits of the business could not be ascribed to the personal activities of the principal stockholders and during this year the same excessive amount of capital was invested in the business.

The record presents no reversible error. Petition is denied.